Walts, Inc., a corporation v. Commissioner.
Walts, Inc. v. Commissioner
Docket No. 6974.
United States Tax Court
1947 Tax Ct. Memo LEXIS 335; 6 T.C.M. (CCH) 22; T.C.M. (RIA) 47003; January 17, 1947
George H. Zeutzius, Esq., and A.P.G. Steffes, Esq., for the petitioner. W. J. McFarland, Esq., for the respondent. HARLAN
Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined a deficiency in the declared value excess profits tax of petitioner for the year 1942 in the amount of $1,021.20, and in excess-profits taxes for the same year in the amount of $28,690. The questions involved are: (1) Whether respondent correctly disallowed certain amounts as deductions by petitioner on the ground that they constituted exclusive compensation for services rendered by W. J. Cunningham and E. D. Morse during the year 1942, and (2) Whether the respondent correctly disallowed amounts paid by petitioner to each of its directors during the same year. Findings of Fact Petitioner, Walts, Inc. *336 , known also by the fictitious name of Aero Alleys, has its principal office and place of business in Los Angeles, California. Its books are kept and its returns filed on the accrual and calendar year basis. Its return for 1942 was filed with the collector of internal revenue for the sixth district of California at Los Angeles. Walter J. Cunningham, the president of petitioner, is a veteran of World War I. Prior to entering the service he completed his high school education, had two years in business college, and one year at Williams College. Upon his discharge from the Army he decided to engage in business, and worked for one year as a claims adjuster with the Travelers Insurance Company. His father had a lumber business in Rochester, New York, and he became associated with his father in the wholesale end of this business in 1920 as a salesman. He was secretary and treasurer of the lumber company from 1922 to 1935, and received compensation of from $12,000 to $15,000, one-half of which was salary and the remainder commission and bonus. The lumber company underwent a reorganization under section 77-B of the Bankruptcy law in 1932, and continued in business until 1935 when it was dissolved. *337 Cunningham then went to the West Coast in October 1936 and secured employment as a salesman with a lumber company, doing practically the same type of work he had been doing in Rochester, and received a salary of $270 a month. He did not receive any commission or bonus. During the course of his employment by the West Coast lumber company, Cunningham met Walter E. Withers and J. Robert Muratta. Withers owned some foundry equipment at Culver City. After looking it over, Cunningham suggested moving the equipment to a different location in an industrial section and organizing a corporation to engage in the foundry business. This was done and petitioner was incorporated under the laws of California on April 24, 1940, with an authorized capital stock of $25,000, divided into 2,500 shares of a par value of $10 a share. Petitioner's articles of incorporation were executed April 22, 1940, by Withers, Cunningham and Muratta who were named therein as its directors. At an organization meeting held on April 25, 1940, Withers was elected president, Muratta vice-president, and Cunningham secretary-treasurer. Withers acquired 100 shares of petitioner's stock by paying therefor $500 in cash and *338 by transferring to petitioner foundry equipment valued at $600. Katharyn S. Cunningham, wife of Walter J. Cunningham, acquired 50 shares by paying therefor $500 in cash which she borrowed from her father. Walter J. Cunningham did not invest any money in petitioner's business, and was not a stockholder at any time. Under date of February 26, 1941, 2 agreements were entered into between petitioner and the Aluminum Company of America, wherein the latter licensed petitioner to use its patented processes for the thermal treatment of casting of aluminum alloy compositions, in consideration of the payment of a royalty of one-half cent per pound on all articles produced by petitioner with the use of such processes. At a meeting of the Board of Directors of petitioner held on March 31, 1941, Cunningham advised the directors that the licensing agreements of February 26, 1941, had been procured for petitioner through the efforts of Katharyn S. Cunningham and that she incurred obligations and expended the sum of $1,140 in obtaining them. A resolution was adopted directing that she be reimbursed for the moneys expended. The direction also authorized the leasing or construction of an adequate *339 plant and the purchase and installation of equipment to maintain said plant for the manufacture of aluminum alloys products. For the purpose of obtaining needed funds, the directors authorized the borrowing of $8,500 from Dorothy M. Morse, the wife of Elmer D. Morse. The authorized loan was made and petitioner gave its note for $8,500 to Dorothy M. Morse. Thereafter a building 40 X 60 feet was leased. At the March 31, 1941, meeting the board also authorized the payment of salaries of $200 per month each to Walter J. Cunningham and Elmer D. Morse for their services. It accepted the resignation of Muratta as a director and vice-president and appointed Morse to succeed him as a director. Withers resigned as a director and president of the corporation, and Walter J. Cunningham was appointed president and Morse secretary and treasurer. At or about the time of the March 1941 meeting Katharyn S. Cunningham became the owner of 75 shares of petitioner's outstanding stock and Elmer D. Morse the owner of the remaining 75 shares, and this ownership of stock prevailed throughout the remainder of the year 1941 and during the year 1942. On January 5, 1942, the stockholders of petitioner had *340 a meeting and elected Walter J. Cunningham, Katharyn S. Cunningham, Dorothy M. Morse, and Elmer D. Morse to be directors. At a directors meeting on the same day a resolution was adopted that Walter J. Cunningham and Elmer D. Morse each be paid at the rate of $24,000 per annum for their services effective as of January 1, 1942. Cunningham was elected president, Mrs. Cunningham vice-president, Morse secretary and treasurer, and Mrs. Morse vice-president. At a meeting held April 10, 1942, petitioner's directors authorized the purchase and installation of a new heat treating furnace at the cost of approximately $5,000 and the erection of an addition to petitioner's plant, together with necessary equipment, to cost approximately $3,000. On June 12, 1942, petitioner's directors authorized its president and treasurer to erect an additional building on the north side of petitioner's plant and to purchase necessary equipment at an expenditure of approximately $2,500. At a meeting held August 14, 1942, petitioner's directors adopted a motion "that each director be paid the sum of $25 for attendance at each meeting of the board of directors". On August 28, 1942, the Aluminum Company *341 of America wrote petitioner that because of the direct and immediate relationship of the heat treatment of aluminum alloy castings to war time production, the license agreement of February 26, 1941, was to be royalty-free from July 1, 1942, until the cessation of hostilities. At a meeting held August 28, 1942, petitioner's directors adopted resolutions that Walter J. Cunningham and Elmer D. Morse each be paid at the rate of $36,000 per year for their services effective as of September 1, 1942. During the period August 28, 1942, to December 30, 1942, inclusive, ten recorded directors' meetings were held at which all four directors were present. The discussions in the meetings dealt chiefly with reports on the increase of the business, bank loans, the construction of additions to petitioner's plant, the purchase of necessary additional equipment, the authorization thereof, and of other expenditures; also that arrangements had been completed for a line of credit with the Bank of America up to Twenty-five Thousand Dollars. During 1942, petitioner's business consisted entirely of the manufacture and sale of airplane parts as a sub-contractor for airplane parts used by aircraft corporations *342 engaged in war work, which said parts were made of aluminum by use of the heating processes covered by the licensing agreements with the Aluminum Company of America. Petitioner's gross sales in 1940 were $1,227.38, and it sustained an operating loss for the year ending December 31, 1940, in the amount of $1,123.58. No salaries were paid by petitioner to any of its officers or directors during 1940. During 1941 petitioner's gross sales amounted to $39,996.19, and respondent determined that petitioner had an adjusted net taxable income of $1,205.92. During 1941 it paid salaries to its officers aggregating $3,300, of which $1,650 was paid to its president, Walter J. Cunningham, and $1,650 to its secretary, E. D. Morse, both of whom devoted their entire time to petitioner's business and operations. During the calendar year 1942 petitioner's gross sales amounted to $434,363.44, and its net profit before payment of salaries to its officers amounted to $85,828.39. During 1942 petitioner paid officers' salaries aggregating $56,000, of which $28,000 was paid to its president, Walter J. Cunningham, and $28,000 to its secretary, E. D. Morse, both of whom devoted their full time to the business *343 and operations of petitioner. In addition, each of the four directors was paid $250 during 1942 for attendance and services at directors' meetings, being at the rate of $25 per meeting per director for ten of the directors' meetings held during 1942. No dividends were paid by petitioner at any time during the period April 24, 1941, to December 31, 1942, inclusive. The gross sales per books of petitioner reflect the following monthly cumulative balances for the period August 31, 1941, to December 31, 1943, inclusive: August 31, 1941
$ 7,208.87
September 30, 1941
10,357.09
November 30, 1941
26,789.91
December 31, 1941
39,996.19
January 31, 1942
11,982.38
February 28, 1942
25,321.67
March 31, 1942
42,455.69
April 30, 1942
65,515.58
May 31, 1942
91,019.92
June 30, 1942
126,858.37
July 31, 1942
170,755.49
August 31, 1942
215,347.22
September 30, 1942
263,711.51
October 31, 1942
311,958.67
November 30, 1942
369,684.11
December 31, 1942
434,363.44
January 31, 1943
68,469.17
February 28, 1943
151,118.93
March 31, 1943
246,500.53
April 30, 1943
337,799.36
May 30, 1943
399,247.60
June 30, 1943
474,109.72
July 31, 1943
551,789.76
August 31, 1943
617,334.03
September 30, 1943
685,084.75
October 30, 1943
776,982.08
November 30, 1943
873,646.35
December 31, 1943
964,862.25
*344 In determining the deficiencies, the Commissioner disallowed $36,000 of the total amount of $56,000 paid equally to Cunningham and Morse during 1942 and claimed as a compensation deduction by petitioner for the taxable year 1942. The respondent also disallowed directors' fees totalling $1,000, paid to the four directors for attendance at ten meetings, at the rate of $25 per meeting. During the year 1942, both Cunningham and Morse devoted from twelve to fourteen hours each day to their duties as president and secretary and treasurer. Cunningham performed a variety of duties during that year including those of general and production manager, sales promotion, metallurgist, shipping clerk, and inspector of castings. Morse, who operated several sporting goods stores prior to his association with petitioner, handled the financial end of the business, office detail, and matters pertaining to the scheduling of parts out of the foundry. Morse severed his connections with petitioner in June 1943. The profit and loss account appearing on the books of the petitioner for the years 1941 and 1942 reflects the following: 1941
1942
Sales
$39,996.19
$434,363.44
Cost of goods sold
31,261.93
329,163.97
Gross profit
8,734.26
105,199.47
Compensation of officers
3,300.00
56,000.00
Other expenses
3,950.04
19,371.08
Net profit (before taxes)
1,484.22
29,828.39
*345 A reasonable allowance for salary for the services rendered by Walter J. Cunningham and Elmer D. Morse to the petitioner as president and secretary-treasurer, respectively, during the year 1942 was $10,000 per annum for each. A reasonable allowance for directors' fees for services rendered by the four directors of petitioner at ten meetings attended by them during the period August 28, 1942, to December 31, 1942, inclusive, was $25 per meeting, or a total of $1,000. Opinion The first contention of petitioner is that the respondent is without power to partially disallow as excessive previously authorized salaries actually paid by petitioner during the taxable year 1942, for services rendered to it in the carrying out of its business. We are not impressed by this contention. Section 23 (a) (1) (A) provides that in computing net income there shall be allowed as a deduction "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *." The petitioner argues that the "including" clause was added by Section *346 234 (a) (1) of the Revenue Act of 1918 to make provision for a reasonable allowance as compensation for services rendered, though none was actually paid, in order to rectify the hardship worked upon partnerships, individual proprietorships and closely held corporations by the excess profits provisions of the Act of October 3, 1917, and that the amendment was intended as a liberalization rather than a restriction in its application. Even if it be assumed that petitioner is correct in its argument, respondent's inquiry as to reasonableness could not be logically limited to amounts not actually paid. In Botany Worsted Mills v. United States, 278 U.S. 282, a case which arose under the 1916 Act as amended by the War Revenue Act of 1917, prior to the addition of the so-called "including" clause, the Supreme Court of the United States said: * * * it is clear that extraordinary, unusual and extravagant amounts paid by a corporation to its officers in the guise and form of compensation for their services, but having no substantial relation to the measure of their services and being utterly disproportioned to their value, are not in reality payment for services, and cannot be *347 regarded as "ordinary and necessary expenses" within the meaning of the section; and that such amounts do not become part of the "ordinary and necessary expenses" merely because the payments are made in accordance with an agreement between the corporation and its officers. Even if binding upon the parties, such an agreement does not change the character of the purported compensation or constitute it, as against the Government, an ordinary and necessary expense. Compare 20 Treas. Dec., Int. Rev. 330; Jacobs & Davies v. Anderson (C.C.A.) 228 Fed. 505, 506; United States v. Philadelphia Knitting Mills Co., (C.C.A.) 273 Fed. 657, 658; and Becker Bros. v. United States (C.C.A.) 7 Fed. (2d) 3, 6. Subsequent to this decision and the incorporation of the "including" clause in section 23 (a) (1) (A), this and other tribunals, in a long line of decisions, have decided that where issue is joined on the question of reasonableness of salaries paid for services rendered, the Commissioner's determination carries a clear presumption of correctness and places upon the taxpayer the burden of proving that it is entitled to a deduction larger than that determined *348 by the Commissioner. The holding of this tribunal in Gustafson Manufacturing Company, (1925), 1 B.T.A. 508, involving the application of Section 234 (a) of the Revenue Act of 1918, which brought into the statute the "including" phrascology, that "Under the provision of this section the Commissioner not only has the authority but it is his duty to determine * * * the reasonableness or unreasonableness of deductions by a corporate taxpayer of compensation paid" has been consistently followed. Moreover, the exact wording of what is now section 23 (a) (1) (A), I.R.C. has been incorporated in every revenue act since 1918, and the respondent's regulations have been substantially the same in each reenactment. These regulations have uniformly stated that the test of deductibility of compensation payments is whether they are reasonable and are in fact payment for services. The continued reenactment of the statute must be construed as legislative approval of these regulations. Our conclusion is that the Commissioner has the power under section 23 (a) (1) (A), to disallow as deductions any part of compensation paid which, in his judgment, does not meet the test *349 of reasonableness. The second contention of petitioner is that the amounts of $28,000 each paid to Cunningham and Morse during 1942, represent reasonable compensation for services rendered and are allowable deductions for that year. We have found as a fact that $10,000 per annum for each of these officers constituted reasonable compensation. It follows that our conclusion is that the remainder of the compensation paid was excessive. In reaching this conclusion we have carefully considered and weighed the stipulated facts, testimony submitted at the hearing, and the documentary evidence. This reveals to our satisfaction that neither Cunningham nor Morse, at the time each of them became officers of petitioner, were qualified either by training or experience to render unique or specialized services. Cunningham had had a long and varied experience in the lumber business and Morse had operated several sporting goods stores. While it appears that both of them devoted long hours to their respective duties, petitioner's success from August 1941 to and including 1942, was primarily attributable to the acquisition of the license to use the heating processes owned by the Aluminum Company *350 of America in producing aluminum parts for aircraft corporations and to the demand for such parts during the war years. The evidence also convinces us that the value of services rendered or to be rendered was not the guiding factor which influenced the directors in authorizing large salaries to be paid to their two officers. On December 31, 1941, the books of petitioner disclosed a surplus of $38.46. Five days later, on January 5, 1942, the directors - Cunningham, Morse and their respective wives - adopted a resolution that the salaries of Cunningham and Morse be increased from $1,650 per annum received by each in 1941, to $24,000 per annum. When Cunningham was asked what yardstick was used to determine the amount of salaries voted at this meeting, he replied "past experience and performances" and stated that what might occur subsequent to January 5, 1942, was not taken into consideration. When his attention was called to the fact that the gross sales of the company for 1941 were only $30,996.19, he stated that perhaps they took into consideration previous work that had been done in forming the corporation and that no compensation was received for this work. Cunningham's wife testified *351 that the reason the directors authorized this increase was that her husband had been in the habit of earning that amount of money in the past. On August 28, 1942, the same day the Aluminum Company of America wrote petitioner that it would have the use of the heat treatment of aluminum alloy castings royalty-free from July 1, 1942, until the cessation of hostilities, petitioner's directors voted Cunningham and Morse a further increase in salary at the rate of $36,000 per annum effective September 1, 1942. Petitioner's sales which amounted to $11,982.38 at the end of January 1942 aggregated $170,755.49 as of July 31, 1942. Cunningham testified that this increase in sales possibly had some bearing on the increase in salaries. His wife testified that increased production and increased responsibilities warranted the increase to $36,000 for her husband and Morse. Cunningham on redirect examination testified that on January 5, 1942, the business outlook for petitioner was very promising inasmuch as it had actual orders at that time totalling $35,000 or $40,000, and that on August 28, 1942, it had a backlog of unfilled orders of approximately $500,000. Petitioner paid Cunningham and Morse *352 $28,000 each a total of $56,000, during 1942, and at the end of the year its books disclosed an earned surplus of only $9,014.83. Prior to December 31, 1942, it had never distributed any dividends to its stockholders. At all times material herein its stock was owned 50 per cent by Cunningham's wife and 50 per cent by Elmer D. Morse. The salaries paid to Cunningham and Morse were in direct relationship to the stockholdings of the respective families. Although an unimpressive attempt was made to prove that the petitioner would have had to pay more than $28,000 if it had hired others to do the work performed by Cunningham, evidence as to the value of Morse's services is limited to testimony that as secretary-treasurer he worked long hours, handled the office detail, scheduled the parts out of the foundry, and did the financing. The equality of compensation paid to these two officers seems to us to be inconsistent with an intention to compensate them on the basis of the value of the services they rendered and the evidence presented indicates a studied plan to anticipate profits to be earned and distribute them in the guise of compensation rather than as dividends. Petitioner has not proved *353 to our satisfaction that a salary of $10,000 per annum for each of them, which was allowed as a deduction by the respondent, did not constitute reasonable compensation for their services. The remaining issue relates to the fees of $25 per meeting paid to the four directors of petitioner for attendance at ten meetings, or a total of $1,000 which was disallowed by the respondent as a deduction for 1942. The evidence discloses that the meetings were held, that they were attended by all of the directors, and that matters such as business progress, bank loans, construction of additions to plant, purchase of necessary additional equipment and its authorization, and under expenditures, were considered. Our best judgment is the $1,000 paid to the directors in 1942 constituted reasonable compensation and we have made a finding to this effect. Respondent should have allowed this amount as a deduction. Decision will be entered under Rule 50.